UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CHAMBERS OF
DEBORAH L. BOARDMAN
UNITED STATES DISTRICT JUDGE

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
(410) 962-7810
Fax: (410) 962-2577
MDD_DLBChambers@mdd.uscourts.gov

September 29, 2021

LETTER TO COUNSEL

    RE:   *Brian H. v. Kijakazi*
           DLB-20-1156

Dear Counsel:

    On May 5, 2020, plaintiff petitioned this Court to review the Social Security Administration's ("SSA's") final decision to deny his claims for Disability Insurance Benefits and Supplemental Security Income. ECF 1. I have considered the parties' cross-motions for summary judgment and plaintiff's response. Pl.'s Mem., ECF 13; Def.'s Mem., ECF 14. I find no hearing necessary. *See* Loc. R. 105.6 (D. Md. 2021). This Court must uphold the denial if the SSA employed correct legal standards in making findings supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Under that standard, I will deny both motions, reverse the Commissioner's decision in part, and remand the case to the Commissioner for further consideration. This letter explains my rationale.

    Plaintiff filed his claims for benefits on September 22, 2016, alleging an onset date of December 13, 2015. Administrative Transcript ("Tr.") 224–35. The SSA denied his claims initially and on reconsideration. Tr. 89, 102, 115, 128. An Administrative Law Judge ("ALJ") held a hearing on February 4, 2019. Tr. 38–76. Following the hearing, the ALJ determined plaintiff was not disabled within the meaning of the Social Security Act during the relevant time frame. Tr. 9–37. Because the Appeals Council denied plaintiff's request for review, the ALJ's decision constitutes the final, reviewable decision of the SSA. Tr. 1–6; *see Sims v. Apfel*, 530 U.S. 103, 106–07 (2000); 20 C.F.R. § 422.210(a).

    The ALJ found severely impaired by "Obesity, Diabetes Mellitus with Diabetic Neuropathy, Degenerative Disc Disease, Depression, Bipolar Disorder, and Status-post Myocardial Infarction." Tr. 14. Despite these impairments, the ALJ determined plaintiff retained the residual functional capacity ("RFC") to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except that he can occasionally climb ladders, ropes, or scaffolds; occasionally stoop,

> kneel, crouch, or crawl; he can tolerate occasional exposure to extreme heat, extreme cold, dust, fumes, odors, gases, poor ventilation, vibrations, humidity, or hazards, such as, unprotected heights and moving machinery; and he can frequently reach with the non-dominant upper extremity. The claimant can have frequent interaction with supervisors and coworkers, occasional tandem work, and occasional interaction with the public.

Tr. 19. After considering the testimony of a vocational expert ("VE"), the ALJ determined plaintiff was unable to perform his past relevant work but could perform other jobs existing in significant numbers in the national economy. Tr. 28–31. Therefore, the ALJ concluded plaintiff was not disabled. Tr. 31.

On appeal, plaintiff argues the ALJ's step-two finding that plaintiff's obstructive sleep apnea was a non-severe impairment is not supported by substantial evidence. Pl.'s Mem. 10–12. Plaintiff also argues the ALJ erred and in finding plaintiff's concentration, persistence, or pace limitations did not require a coordinate RFC limitation. *Id.* at 12–14. I agree the ALJ's finding that plaintiff's sleep apnea was a non-severe impairment is not supported by substantial evidence. Further, I find the error was not harmless because the ALJ did not discuss plaintiff's fatigue during the RFC analysis despite finding that plaintiff was limited by a number of impairments that cause fatigue. Accordingly, I remand, but I express no opinion as to plaintiff's ultimate entitlement to benefits.

In the context of Social Security, severity is a term of art. "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a), 416.922(a). Elsewhere, the SSA does not reference the significance of the limitation and describes "[a] severe impairment" as "one that affects an individual's ability to perform basic work-related activities." Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, at *11 (Oct. 25, 2017). Examples of basic work activities include, but are not limited to, "(1) [p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) [c]apacities for seeing, hearing, and speaking; (3) [u]nderstanding, carrying out and remembering simple instructions; (4) [u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers and usual work situations; and (6) [d]ealing with changes in a routine work setting." 20 C.F.R. §§ 404.1522(b), 416.922(b).

An ALJ's finding that an impairment is non-severe must be supported by substantial evidence. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). "In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [the Court's] judgment" for the ALJ's. *Craig*, 76 F.3d at 589. "However, '[the Court] do[es] not reflexively rubber-stamp an ALJ's findings.'" *Triplett v. Saul*, --- F. App'x ----, 2021 WL 2580589, at *6 (4th Cir. 2021) (per curiam) (quoting *Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017)). "To pass muster, ALJs must 'build an accurate and logical bridge' from the evidence to their conclusions." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)). Further,

Brian H. v. Kijakazi
DLB-20-1156
September 29, 2021
Page 3

"[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)).

Plaintiff argues substantial evidence does not support the ALJ's step-two finding that his obstructive sleep apnea was a non-severe impairment. The Commissioner disagrees, arguing the ALJ's finding is supported by substantial evidence or, alternatively, that any error is harmless. To resolve this dispute, a comprehensive review of the evidence relating to plaintiff's sleep apnea is necessary.

On January 17, 2017, plaintiff reported to a neurologist for a sleep evaluation. Tr. 895. Plaintiff "complain[ed] of snoring, periods of not breathing, tossing and turning, kicking, decreased memory, decreased concentration, decreased sexual drive, excessive daytime sleepiness, falling asleep while reading, watching television, awakening in the middle of the night because of SOB, leg cramps, urination, increased in weight 15 lbs, sinus problems, congested nose, feels sleepy during the day, take naps during the day." Tr. 895. Plaintiff reported that "[s]ymptoms began several years ago, gradually worsening since that time." Tr. 895. Plaintiff reported that he went to bed at 10 p.m. and awakened at 7 a.m. on both weekdays and weekends. Tr. 895–96. Plaintiff reported that it took him five minutes to fall asleep and denied that he slept in a noisy environment, in a room at an uncomfortable temperature, or in an uncomfortable bed. Tr. 896. Plaintiff reported that he had done a "PSG" ten years ago but was not able to finish the study due to his difficulty sleeping. Tr. 896. The neurologist ordered a sleep study. Tr. 899.

On March 7, 2017, plaintiff received the results of his sleep study. Tr. 892. They "indicated severe obstructive sleep apnea with AHI of 32, predominately hypopnea events = 136, central apnea events = 48, obstructive events = 4." Tr. 892. At that appointment, the provider noted plaintiff was positive for fatigue and sleep disturbance. Tr. 892. Plaintiff was diagnosed with obstructive sleep apnea. Tr. 894. The provider opined that it was in plaintiff's "best interest for an overnight sleep-lab pressure titration study" and that plaintiff should "consider use of CPAP or BiPAP." Tr. 895. The provider noted that those would be ordered "once [they] receive[d] the recommendations from the titration study." Tr. 895.

Plaintiff's titration study occurred on April 27, 2017. Tr. 1029. Plaintiff reported that he had taken one 30-45 minute nap earlier in the day. Tr. 1029. Upon awakening after the study, plaintiff reported that "he felt very groggy and still sleepy, describing sleep as moderately sound yet atypical due to difficulty with acclimatizing to the mask." Tr. 1030. Thus, the provider noted that plaintiff's sleep was "worse than usual." Tr. 1030. Plaintiff spent 380.7 minutes in bed and was asleep for 303.7 of those minutes. Tr. 1030. His sleep efficiency was 79.8 percent. Tr. 1030. His sleep architecture and latency were normal. Tr. 1030. There was 3.8 percent Stage N1, 83.2 percent Stage N2, 0.5 percent Stage N3, and 12.5 percent Stage R sleep. Tr. 1030. Plaintiff's apnea/hypopnea index was 4 events per hour. Tr. 1030. The impression was a "[f]avorable response to Positive Airway Pressure (PEP) therapy." Tr. 1030. It was suggested that plaintiff

*Brian H. v. Kijakazi*
DLB-20-1156
September 29, 2021
Page 4

use PAP therapy with settings of "8cm H20." Tr. 1030. Plaintiff had two REM episodes and woke up six times. Tr. 1032.

On June 25, 2018, plaintiff underwent another sleep study. Tr. 1080. During the diagnostic period of testing, plaintiff spent 151.9 minutes in bed with a total sleep time of 134.5 minutes. Tr. 1081. His sleep efficiency was 88.5 percent. Tr. 1081. His sleep architecture and latency were normal at 4.5 minutes. Tr. 1081. He spent 6.7 percent of the time in Stage N1 and 93.3 percent of the time in Stage N2. Tr. 1081. He did not spend any time in Stage N3 or Stage R. Tr. 1081. He spent half a minute with his oxygen saturation below 89 percent. Tr. 1081. His AHI was 51.7 events per hour. Tr. 1081. Plaintiff's Respiratory Disturbance Index was 51.7 events per hour. Tr. 1081. During the therapeutic period of testing, plaintiff spent 239.6 minutes in bed and 225 minutes asleep. Tr. 1081. His sleep efficiency was 93.9 percent. Tr. 1081. His sleep architecture and latency were normal. Tr. 1081. He spent 1.8 percent of the time in Stage N1, 81.8 percent of the time in Stage N2, 12.0 percent of the time in Stage N3, and 4.4 percent of the time in Stage R sleep. Tr. 1081. Plaintiff spent no time with an oxygen saturation below 89 percent. Tr. 1082. His AHI was 20.2 events per hour with an AHI in REM sleep of six per hour. Tr. 1082. The diagnosis was severe obstructive sleep apnea syndrome. Tr. 1082. Between the 11:04 p.m. and 5:36 a.m. plaintiff experienced one REM episode and woke up 13 times. Tr. 1083. The notes include a description of plaintiff's comments:

> He felt foggy and not at peak. According to the patient's own reckoning, daytime napping and alcohol consumption were both denied. Consumption of about 10 ounces of caffeinated beverage(s) before 0800 hours. Upon being awakened, he felt foggy and a little slowed down, describing sleep as restless, worse than usual. He c/o usual morning aches and pains.

Tr. 1087.

On December 4, 2018, plaintiff met with his provider to review his CPAP report. Tr. 1162. The notes indicate that "[i]n [a] recent visit, the upper limit of his CPAP pressure was changed from 18cm to 20cm h2o pressure to try and treat an unusually higher AHI of 16." Tr. 1162. Plaintiff "was having worse c/o insomnia, fatigue, interrupted sleep pattern, for which [the provider] increased his [T]razadone to 100mg nightly." Tr. 1162. At the December 4, 2018 appointment, plaintiff's "CPAP show[ed] an even higher AHI = 21.8." Tr. 1162. The peak average pressure delivered was 18cm. Tr. 1162. Plaintiff's "CPAP pressured were titrated up to 8cm h2o pressure." Tr. 1162. Plaintiff was positive for apnea and sleep disturbance. Tr. 1162.

At plaintiff's February 4, 2019 hearing, plaintiff discussed the impact his sleep apnea had on his functioning:

> [Attorney]: Okay. Are you still using your CPAP machine?
> [Plaintiff]: I am.
> [Attorney]: What do you use that for?? [sic]
> [Plaintiff]: I, I have sleep apnea.

*Brian H. v. Kijakazi*
DLB-20-1156
September 29, 2021
Page 5

> [Attorney]: Okay, and could you describe your, your sleep at the present time?
> [Plaintiff]: I get maybe three hours of sleep a night. I have approximately 12 to 15 episodes of not breathing per hour, for which my doctor is working on adjusting my machine to a better calibration.
> [Attorney]: And does that impact your energy level during the course of a typical day?
> [Plaintiff]: It, it does. It does completely.
> [Attorney]: And could you explain how?
> [Plaintiff]: I am, I'm fatigued all throughout the day. I fall asleep just sitting in a chair. I have come close to falling asleep by [sic] driving a few times. I'm just extremely, extremely tired and, and just don't have the energy level to do anything.

Tr. 59–60. Plaintiff has reported to mental health providers at least twice that the CPAP does help his sleep. Tr. 1208, 1499.

Considering the evidence, the ALJ in this case found plaintiff's sleep apnea was a non-severe impairment. The full extent of the ALJ's step-two evaluation of plaintiff's sleep apnea is as follows:

> The record also reflects the claimant has medically determinable impairments of hypertension, hyperlipidemia, erectile dysfunction, seafood allergy, and sleep apnea. However, there is no evidence that these impairments have more than a minimal effect on the claimant's ability to perform basic work activities. As such, I find that the impairments are not "severe" impairments, as defined in the regulations.
>
> Specifically, in regard to the claimant's sleep apnea, the claimant uses a CPAP machine on a nightly basis. A sleep study conducted in March of 2017 indicated severe obstructive sleep apnea with 32 apnea or hypopnea events per hours. In December of 2018, the claimant's CPAP readings revealed an average 21.8 apnea or hypopnea events per hour. Despite the continued events, the claimant reported that his sleep is better when using the CPAP machine.

Tr. 15 (internal citations omitted).

The majority of the evidence the ALJ cited does not logically support the ALJ's conclusion that plaintiff's sleep apnea was not severe. The only evidence the ALJ cited to find plaintiff's sleep apnea was not severe is a single treatment note from a mental health provider in which plaintiff reported his sleep improved with the CPAP machine. *See* Tr. 15; Tr. 1499 (containing a treatment note from March 15, 2018, in which the provider noted plaintiff's "[s]leep is a lot better with his C[PAP] machine"). First, an isolated statement that sleep is better with a device designed to treat plaintiff's impairment does not logically support the ALJ's finding that plaintiff's sleep apnea has only a minimal effect on his ability to do work activities. Better is a relative term that does not in itself describe the severity of an impairment. The treatment note was generated only a

*Brian H. v. Kijakazi*
DLB-20-1156
September 29, 2021
Page 6

few months before plaintiff underwent a second sleep study in which it was concluded that plaintiff continued to experience severe sleep apnea. *See* Tr. 1087, 1499. Thus, plaintiff's statement that his sleep was "better" when he wore a machine designed to improve sleep must be contextualized within evidence that consistently revealed severe sleep apnea. Second, the ALJ selected one statement in the record—which came from the treatment notes of a mental health provider who did not treat plaintiff's sleep apnea—that does not describe plaintiff's sleep apnea as severe. The evidence from the providers who treated plaintiff's sleep apnea consistently observed that plaintiff had severe sleep apnea. Because the ALJ's conclusion that plaintiff's sleep apnea was non-severe is supported only by "a mere scintilla" of evidence, I find that the step-two finding is not supported by substantial evidence. *See, e.g.*, *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The Commissioner argues any error is harmless because the ALJ considered all plaintiff's impairments—including his non-severe impairments—when formulating plaintiff's RFC. Def.'s Mem. 7–8; *see* 20 C.F.R. §§ 404.1545(a)(2), 419.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not severe . . . when we assess your [RFC]."). While the regulations plainly require ALJs to consider limitations from non-severe impairments during the RFC analysis, I disagree the ALJ did so in this case. Here, during the RFC analysis, the ALJ did not mention or consider plaintiff's sleep apnea. *See* Tr. 19–28. The ALJ specifically attributed the RFC findings to plaintiff's severe impairments. The ALJ concluded "[a] limitation to sedentary work . . . adequately accommodate[d] [plaintiff's] symptoms from his medically determinable impairments of obesity, diabetes mellitus with diabetic neuropathy, and degenerative disc disease." Tr. 25. The ALJ also concluded "[t]he additional environmental limitations accommodate[d] [plaintiff's] symptoms from his diabetes mellitus with diabetic neuropathy and his status-post myocardial infarction." Tr. 25. Absent from the discussion is a reference to plaintiff's sleep apnea.

Furthermore, during the RFC analysis, the ALJ failed to analyze plaintiff's fatigue that resulted from several of his impairments. The ALJ noted plaintiff's statement "that he gets fatigued during the day." Tr. 20. The ALJ also noted one of plaintiff's treating providers twice opined plaintiff "had a guarded prognosis with symptoms such as . . . chronic fatigue." Tr. 26–27. The ALJ accorded this evaluation "limited weight" because "it [was] not supported by the medical evidence of record." Tr. 26. The ALJ then discussed plaintiff's lack of edema in his lower extremities, which related to other parts of the provider's opinion, but the ALJ did not address plaintiff's fatigue or specify which part of the record was inconsistent with plaintiff's statements of his fatigue. Tr. 26–27. The ALJ discussed plaintiff's fatigue no further. *See* Tr. 19–28.

The ALJ's error in failing to discuss plaintiff's fatigue is particularly harmful considering the extensive documentation of plaintiff's fatigue in the record. For example, on January 8, 2019, plaintiff's provider reported that plaintiff experienced "severe intractable pain, fatigue, [and] insomnia." Tr. 1181, 1184. He also reported plaintiff experienced "impaired sleep." Tr. 1182. In relation to plaintiff's mental impairments, a mental health provider noted on November 2, 2018, that plaintiff experienced "fatigue—observable almost daily—without physical exertion." Tr. 1200. On November 14, 2018, a mental health provider noted that plaintiff "stated he hears 'random gibberish' when attempting to sleep at night 1-2xs per week, first started 2 years ago

*Brian H. v. Kijakazi*
DLB-20-1156
September 29, 2021
Page 7

around the time of double b[y]pass." Tr. 1203. Plaintiff reported that "[h]is sleep was described as disruptive for years until father passed away." Tr. 1203. Plaintiff reported that he went to bed at 8:30-9, woke up at 2:30 a.m. for 20 minutes, and fell back asleep until 8 a.m. Tr. 1203.

Plaintiff was voluntarily admitted to the hospital on September 30, 2018, for suicidal ideation. Tr. 1096. Plaintiff reported to the providers in the emergency department that he "was up almost all night [the night before] thinking of ways to end [his] life." Tr. 1096. It was noted that "[h]is sleep [was] chronically poor." Tr. 1096. The record contains notes from each day plaintiff was hospitalized. Tr. 1092. On October 2, 2018, plaintiff reported sleeping poorly the night before. Tr. 1092. He reported auditory perceptual disturbances in the night. Tr. 1092. He described the disturbances as "multiple voices, mostly gibberish, which were at a 4/10 intensity." Tr. 1092. On October 3, 2018, plaintiff reported sleeping poorly the night before. Tr. 1092. Plaintiff cited "being on a one-to-one for his CPAP as the main issue." Tr. 1092. He felt "irritated [that day] due to lack of sleep." Tr. 1092. Plaintiff's "energy, motivation, [and] mood all continue[d] to be low." Tr. 1092. He reported that the "[a]uditory perceptual disturbances [were] improving, 3/10 [that day.]" Tr. 1092. Plaintiff's Ambien was increased to "7.5 mg HS." Tr. 1092. On October 4, 2018, plaintiff reported "there were no significant issues" overnight and he "slept okay." Tr. 1092. "He report[ed] . . . that his sleep was more restful and he [was] 'doing better.'" Tr. 1092. On October 5, 2018, the record shows that "[o]vernight there were no significant issues and [plaintiff] slept well." Tr. 1092. He reported that "his mood was tired but 'not bad, up a little bit.'" Tr. 1092. On October 6, 2018, plaintiff reported he was "feeling tired during the day." Tr. 1092. On October 7, 2018, plaintiff reported to the nursing station at night after having a dream about dying. Tr. 1092. He was "at times sleepy during the day—though [he] report[ed] less so with [Z]oloft and [A]bilify moved to night." Tr. 1092. On October 8, 2018, plaintiff reported that "[o]vernight there were no significant issues and [he] slept well." Tr. 1092. He felt "about 75-80 percent back to his baseline." Tr. 1092. "Other than feeling somewhat sleepy[,] which he attribute[d] to his medications, he [was] doing well with respect to energy." Tr. 1092. On October 9, 2018, the notes indicate that "there were no significant issues" overnight. Tr. 1092. "He report[ed] having slept well." Tr. 1092. "His energy [was] improved." Tr. 1092. Plaintiff was discharged that day. Tr. 1092.

Plaintiff reported for a psychiatric diagnostic interview after his release from the hospital. Tr. 1195–1200. The notes indicated plaintiff "exhibit[ed] symptoms of inattention." Tr. 1195. He was "often forgetful," and his work, projects, or tasks were often not completed. Tr. 1195. He reported that "he ha[d] difficulty falling . . . [and] staying asleep." Tr. 1195. He reported "early morning awakening." Tr. 1195. Later, the notes indicate that plaintiff's "depressed mood . . . [was] primarily manifested by . . . [f]atigue—observable almost daily—without physical exertion." Tr. 1200.

With respect to plaintiff's heart impairment, plaintiff's cardiologist has offered two ratings of the severity of the impairment. His cardiologist described the severity of the condition using the New York Heart Association ("NYHA") rating system. Plaintiff's cardiologist reported his condition was "NYHA Class III," Tr. 867, and later reported plaintiff's condition was "NYHA Class II-III," Tr. 941. Class II indicates "slight limitation of physical activity. Comfortable at rest.

*Brian H. v. Kijakazi*
DLB-20-1156
September 29, 2021
Page 8

Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath)."[1] Class III indicates "[m]arked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea."[2] And, as discussed above, the ALJ assigned these opinions "little weight," but the ALJ did not explain what evidence of record suggested that plaintiff did not experience fatigue. *See* Tr. 26–27.

The Commissioner argues the ALJ addressed plaintiff's fatigue, but she cites only instances in which the ALJ noted plaintiff appeared "alert" at appointments. Def.'s Mem. 4–6. Yet, isolated instances in which providers observed plaintiff was alert do not logically support the conclusion that plaintiff can be alert five days per week, eight hours per day. *See* Social Security Ruling 96-8p, 1996 WL 374184, at *1 (July 2, 1996) ("Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."). The record in this case contains substantial evidence that suggests plaintiff may be limited by fatigue. The ALJ failed to explain her reasoning for not crediting such evidence. Accordingly, I disagree that the step-two error in this case is harmless and find that remand is necessary.

For the reasons set forth herein, plaintiff's motion for summary judgment, ECF 13, is denied, and the Commissioner's motion for summary judgment, ECF 14, is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the SSA's judgment is reversed in part due to inadequate analysis. The case is remanded for further proceedings in accordance with this opinion.

Despite the informal nature of this letter, it should be flagged as an opinion. A separate order follows.

Sincerely yours,

/s/

Deborah L. Boardman
United States District Judge

---

[1] *Classes of Heart Failure*, American Heart Association, https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure (last accessed September 27, 2021).

[2] *Id.*